No. 2678.

LOUIS HAWKINS *v.* THE STATE.

1. PRACTICE—INCOMPETENT WITNESSES.—Subdivision 2 of article 730 of the Code of Criminal Procedure denounces as incompetent to testify in criminal actions, "children or other persons who, after being examined by the court, appear not to possess sufficient intelligence to relate transactions with respect to which they are interrogated, or who do not understand the obligation of an oath."

2. SAME.—There is no precise age under which a child is deemed incompetent to testify, but when under fourteen years of age competency is

determinable by an examination, and the action of the trial court thereon will not be revised in the absence of a showing that its discretion was abused, and unless an abuse of discretion is apparent. The objections to the witness in this case are solely as to his youth and ignorance. His examination disclosed that while he inadequately, if at all, understood the obligation of an oath, he knew that it was right to speak the truth and wrong to speak falsely. He was held competent and testified, and his narrative of the facts within his knowledge was not merely clear, concise, positive and intelligent, but was corroborated by physical facts discovered and detailed by other witnesses. *Held*, that in holding the witness competent, the trial court did not abuse its discretion.

3. SAME—IMPEACHING TESTIMONY.—The wife of the deceased, who had been previously tried for complicity in the same offense, and had been acquitted, testified for the defense on this trial, and, to impeach her testimony, the state was permitted to prove contradictory statements previously made by her. The objection urged to this by the defense was that she was under arrest at the time she made the said contradictory statements, and that the evidence was hearsay. *Held*, that the objection was properly overruled. Articles 749 and 750 of the Code of Criminal Procedure, excluding confessions made in duress, apply only to the confessions or admissions of *a defendant who is on trial*, made when under arrest, and they can not be extended to parties not on trial. Whilst hearsay so far as the defendant was concerned, the said contradictory statements were admissible to impeach the witness, to which sole purpose they were properly limited by the charge of the court.

4. PRACTICE—NEW TRIAL.—In support of the motion for new trial, the defense filed the affidavit of a third person to the effect that after the trial of Sarah Washington, for the same offense, and before the trial of the defendant, one of the jurors who tried the defendant, said that the said Sarah Washington should have been awarded the death penalty, and that the testimony on her trial and that on the trial of defendant was essentially the same. The counter affidavit of the impugned juror affirms that he had no recollection of making the statement imputed to him, and that, if he made it, he made it in jest, and that he tried the defendant without bias or prejudice, and solely upon the evidence adduced and the law given in charge. *Held*, that the motion for new trial was properly overruled.

5. MURDER—FACT CASE.—See the statement of the case for evidence *held*, although circumstantial, to be sufficient to support a capital conviction for murder.

APPEAL from the District Court of Falls. Tried below before the Hon. Eugene Williams.

The death penalty was assessed against the appellant upon his conviction in the first degree for the murder of Addison

Washington, in Falls county, Texas, on the twenty-sixth day of September, 1887.

Minerva Huddleston, the mother of the deceased, was the first witness for the State. She testified that the deceased was killed at his home on the Battle farm, on the east bank of the Brazos river, in Falls county, Texas, on the twenty-sixth day of September, 1887. Deceased's family at that time consisted of his wife, Sarah, whom he married in the preceding June, his infant daughter by a former wife, and Willie Bibb, a youth ten or eleven years old. The witness had lived with deceased since his marriage until two or three weeks prior to his death. Sarah Washington, previous to her marriage with deceased, had lived in adultery with the defendant. Deceased and Sarah lived contentedly as man and wife, having, so far as witness ever discovered, no trouble other than occasional conjugal spats that are inseparable from the married state. A few days before the witness left the deceased's house, Sarah went to Hickerson's farm, where the defendant was at work, and remained there all evening. Deceased was not at home on that day.

Willie Bibb testified, for the State, that he was living with the deceased at the time he was shot and killed. The fatal shot was fired into the house through a window on the east end of the house and took effect in the back of the deceased, who was sitting at the supper table, eating, with his back toward the said window. It was then about dusk or "first dark." Just before sundown the witness and the deceased went to the river, fishing, but remained only a short time. They merely baited their hooks and set them out in the river, and then returned to the house, each with a "turn" of wood. They found Sarah Washington on the bed, complaining of being sick. Deceased made a fire, cooked supper, put it on a table in the corner of the room, sat down at the table, with his back to the east window, and began to eat, when a shot was fired into the room through the said window. Deceased fell back, but not out of the chair, uttered a single cry—"Oh"—and expired. The shot frightened and confused Sarah Washington and witness, who, after a few moments of inaction, fled from the house through the south door, and over a little path around the corner of the house to the house of Mr. Henry Hickerson. As the witness passed the corner of the house, in the wake of Sarah, he saw a man, whom he took to be the defendant, running from the vicinity of the house toward the slough, and over the trail that

crossed the slough just back or north of the house. That man, who had a gun in his hands, fell into the slough, and used his gun in getting up.

Continuing his testimony, this witness stated that he knew the defendant well, having lived with him when he and Sarah Washington lived together as man and wife. The defendant was crippled in his left foot and limped in walking or running. He owned a musket gun when the witness lived with him    A short while before he and the deceased went fishing on the fatal evening, the witness went to the point in the rear of the house near where the slough empties into the river, to dig bait, and while digging bait he saw the defendant squatted behind a "clump" of willow bushes that had grown up around a stump. He then had a gun in his hands.    He was between twenty and thirty steps distant from the witness, but did not speak to him. When the witness went back to the house a few minutes later he told his aunt, Sarah Washington, about seeing defendant behind the stump with a gun in his hands, and the said Sarah told him that if he told anybody about it she would whip him. As a consequence, being afraid of his aunt Sarah, he did not tell the deceased about seeing defendant behind the stump. The killing occurred on Monday night.    On the previous Sunday the witness visited the Rickelman farm, and there met the defendant.    When he started home defendant stopped him and told him to tell Sarah to bake him a cake, and that he would come to her house after it on the first rainy day or night.    The witness delivered the message.    The day of the killing was the first rainy day that followed.    Witness frequently heard the deceased and Sarah quarreling about the defendant.

On his cross examination, the witness stated that deputy sheriff John T. Barlow came to the house of the deceased on the morning after the tragedy and made an examination of the premises and vicinity.    Mr. Barlow asked witness if he knew who killed Addison Washington, and witness told him that he did not; to which Mr. Barlow replied that he believed the witness did know; cursed and swore at witness, and finally told him that if he did not tell who did the killing, a mob would come and hang witness; but that if witness would tell, he, Barlow, would see that witness was not hurt.    The witness became frightened and told Barlow the facts to which he has testified on this trial.    Re-examined, the witness said that a few days after the killing of deceased, he went to the place of

the deceased with justice of the peace Elam, and pointed out to him the place where he dug the fish bait, and the place where he saw the defendant squatted behind the stump. After telling Barlow what he knew about the killing, the witness told him that he was afraid to stay in the bottom among the negroes, and asked to be placed in the care of the whites pending the trial of the defendant. At his request he was then placed in charge of Mr. John Stuart, whom he had known at Hearne. He remained with Mr. Stuart until the former trial of defendant, since when he had lived with Sam Patillo, who was the husband of one of his aunts. The witness was afraid of his aunt Sarah Washington, and refused to testify on the examining trial until she was removed from the court room.

John T. Barlow testified, for the State, that he was a deputy sheriff of Falls county at the time Addison Washington was killed. He went to the place of the killing—Washington's house—early on the morning after the assassination, arriving before sundown. He found the dead body of Addison Washington sitting in a chair at a table on which were several plates of food, cups and saucers, etc. Saw ten or fifteen slugs and buckshot had penetrated the back and shoulders of deceased. Witness extracted one slug and one buckshot from the body. The witness then made a careful examination of the premises and vicinity. At a point in a slough, just north of the house, the witness discovered a stump surrounded by willow brush, behind which some person had sat. A person sitting behind that stump could not be seen from deceased's house. Near that stump the witness found the tracks of a man and woman. The woman's track led from the house to the stump. Witness trailed the man's track from the stump, along the bank of the slough, to the north side of the house, and thence to the east window of the house, through which it was said the fatal shot was fired. That window was an ordinary glass window from which one of the panes had been broken. A piece of plank was nailed over the broken pane. It did not entirely close it, but left an open space wide enough to admit the insertion of the muzzle of a single barreled gun, but not of a double barreled gun. There was no powder burn on the sides of the said crack or open space. From the window the witness trailed the said track over the trail to the crossing of the slough, where the ground showed that the man had fallen. At this same place the witness found the unmistakeable impression of the muzzle

of a single barreled gun. It had rained on the previous day, leaving in the slough a bed of red colored mud, but no water. The track showed to have been made by a man crippled in the left foot or leg, the left stride, although the man was running, being much shorter than the right stride, and the ball only of the left foot making a clear impression, while the impression of the right foot was perfect, clear and distinct. Witness trailed that track a considerable distance up the Brazos bottom, and then, leaving others to follow it in all of its meanderings, he went to the house of Tennessee Stephenson, where he secured the defendant's single barreled musket. He soon afterwards found and arrested the defendant in a house a few hundred yards distant from Tennessee's house.

While following the trail of the man, between the place of the homicide and the house where he arrested defendant, the witness found a point where, as shown on the ground by the impression of the butt of the gun, the tracks and fragments of newspaper scattered about, the party stopped and loaded the gun. The trigger guard, barrel and butt of the defendant's gun showed distinct mud signs when witness secured it, and it showed plainly that it had been grasped in muddy hands, the skin creases of the hand even showing. The witness took that gun to Jack Brewer, the gunsmith, and had the load withdrawn. Brewer first drew from the gun a piece of newspaper wadding, then buckshot, then some powder, and from beneath this powder he took other powder mixed with mud. The substance nearest the tube was almost wholly moist or wet mud, similar in color to the mud in the slough near the deceased's house where the man fell down. The gun in its then condition could not have been discharged. There was a fresh "hat" or musket cap on the tube, and the appearance of the barrel at the muzzle indicated to the witness, who was a fire arm expert, that the gun had been recently discharged. The high weeds between the house of the deceased and that wherein the defendant was arrested, along the trail pursued by the fleeing man, were wet from the recent rain, and could not have been passed through without wetting the traveler.

After arresting the defendant the witness returned to the house of the deceased, where he met Willie Bibb, a negro boy about ten or eleven years old. He asked Willie who killed Addison Washington. He replied that he did not know. The witness told him that he was satisfied he did know; that he,

witness, had found his, Willie's, track at a place in the slough near the stump behind which the party had sat, and where evidently he, Willie, had been digging fish bait; that he, Willie, would not be hurt if he would tell what he knew about the killing, but that he, witness, would hang him if he did not tell who did the killing and who made the tracks behind the stump. Thereupon Willie Bibb told the witness substantially the same facts he has testified to on this trial. Willie Bibb then told the witness that, having disclosed what he knew, he was afraid to remain in the bottom with the negroes, and asked to be placed in the care of the whites, and at his further request he was placed with John W. Stuart. He afterwards stayed in turn with Justice of the Peace Elam, J. R. Bates and Sam Patillo's wife. The witness observed on the examining trial that Willie Bibb would weep, in evident fright, instead of replying to questions, until Sarah Washington was removed from the court room, when he related in detail the narrative he has related on this trial. Witness arrested Sarah Washington immediately after he secured the statement of Willie Bibb, on the morning after the murder, and sent her to the Marlin jail in the custody of Burrell Young and Tom Sanders. It was before the arrest of Sarah Washington that witness found the woman's track near the stump mentioned. He then got a new pair of woman's shoes from deceased's house and applied them to the said tracks (which appeared to be fresh). The shoes and the tracks were about the same in length, but otherwise the fit was not perfect. He then returned to the house and got an old pair of woman's shoes, the sole of one of which was whip-sewed to the upper with a piece of fishing line or small wire—witness did not remember which. He applied those shoes to the said tracks and found them to correspond perfectly, the tracks even showing the impression of the fish line or wire. That shoe was slightly run down at the heel, which showed distinctly in the track. Witness asked Sarah Washington who killed Addison, and she denied that she knew anything about the killing. The shot taken from the body of the deceased were larger than the shot extracted from the gun.

Tennessee Stephenson testified, for the State, that she lived on the Parker place about two miles from Marlin. The defendant boarded with the witness in September, 1887, occupying the small shed room which adjoined witness's room. A drizzling rain fell on the morning of September 26, 1887, and early

on that morning the witness's son, Hiram Robinson, and the defendant left witness's house to go deer hunting. Her said son did not return home until the next day. The witness remained at home all day on the said September 26, 1887, and knew that defendant did not come back to the house on that day. Dave Berry visited witness that night and remained with her until just before the down train from Waco signalled Marlin, which was at half past ten o'clock. The witness retired immediately after Berry left and went to sleep. She had been asleep some time—she did not know how long—when the defendant awakened her to let him in. She opened the door and he entered with his gun in his hands. After he got to his room he asked witness for some dry clothes, remarking that those he had on were wet. The witness gave him his dry clothes and went to sleep. Defendant was not married. Witness was married, but did not know the whereabouts of her husband.

Hiram Robinson testified, for the State, that he and the defendant left Tennessee Stephenson's house on the morning of September 26, 1887, to go hunting. Defendant did not have his gun at the time, but told witness he had it in Hamp Chisholm's field. He had ammunition, consisting of powder, large buck shot and "hat-caps" for a musket, and while at the house, the witness saw him with some slugs. Defendant got his musket from under some mulberry brush in Chisholm's field. He then told witness to go to the point where some parties were blowing hunting horns, and ascertain if they could join that hunting party, and to meet him at the foot log crossing of the slough. Witness went to the parties blowing the horns, and found that they were not going hunting. He and a boy named Miles then went to the foot log, and not finding defendant, they went hunting. Witness spent that night with Miles and returned home next day.

Deputy sheriff Charles A. Norwood testified, for the State, substantially as did the witness Barlow as to the indications, etc., on the ground about the house of the deceased, as seen by him on the morning after the killing. He measured the track going from the east window, and afterwards applied that measure to the track of the defendant made on the jail floor. The two tracks measured exactly the same. Defendant was lame in the left foot, only the ball of that foot touching when he walked. Defendant's gun was examined by witness on the

morning after the killing. It had the appearance of having been recently discharged.

James Tolliver testified, for the State, that less than two weeks before the killing of deceased, he met the defendant in Marlin, and, to tease him, asked him: "How are you and Addison Washington getting along since he married your gal?" He replied: "Bad; I have heard that Addison has been threatening me. If he crosses my path, I will set him up in less than two weeks."

Doctor George J. Elam, justice of the peace of the precinct in Falls county in which the murder of Washington occurred, was the next witness for the State. His testimony relating to the dead body, the tracks, etc., about and in the vicinity of the deceased's house, as viewed by him on the day after the killing of Washington, was substantially the same as that of Barlow. He did not, however, find the lame foot track nearer the east window than six or eight feet, but a great many people had been on the ground before he arrived. He described the trail from the house substantially as Barlow, including the indications on the ground where the refugee stopped and loaded his gun. This witness observed that the tracks of the man and woman at the willow clump were about five feet apart, and, though fresh, it looked to him like the track of the woman was made before the rain, and that of the man after the rain of the night before. According to this witness, a person standing at the east end of the deceased's house could not have seen the fall of a person in the slough at the point where the fleeing man fell, nor from any point in the path that led to Hickerson's house. Witness followed the lame foot track to the turnpike road within four or five hundred yards of Tennessee Stephenson's house.

On cross examination this witness testified that the boy Willie Bibb was examined before him on the inquest upon the body of deceased. He first testified that he knew nothing about the killing. He was apparently watched by Sarah Washington, and as often as he caught her eye he wept and showed embarrassment. Witness then had Sarah removed from the court room, when Willie Bibb told substantially the same story he has testified to on this trial.

The State closed.

Ned Carter was the first witness for the defense. He testified, in substance that, en route to his home, over the turnpike

road, he passed Tennessee Stephenson's house about dark on the evening of the fatal day—that being the hour the fatal shot was fired, as fixed by the State's witnesses.   When he got immediately opposite Tennessee's house, some person uttered a loud halloo, and the witness felt satisfied that he recognized in that halloo the voice of the defendant; and so informed Ab. Bogin, on the next morning when Bogin told him of the arrest of defendant.   Tennessee Stephenson's said house was between four and five miles distant from the house of the deceased.   On his cross examination this witness admitted that he drank a great deal in Marlin on the said twenty-sixth day of September, and, as a matter of fact, had a very imperfect recollection of the route he traveled home on that night, and a very indistinct recollection of what he told Bogin on the next day.   The witness did not see the defendant on the fatal evening.   Bogin corroborated Carter as to the statement made to him by Carter on the morning after the killing.

Sarah Washington, the widow of the deceased, testified, for the defense, that she was at home when the deceased was killed, on September 26, 1887.   She had been sick all day.   Deceased cooked his supper himself, placed it on the table, and sat down to the table, with his back toward the east window. About that time the witness went to the fire place to get, for the deceased, some potatoes she had put in the ashes to roast. The shot was fired into the house through the east window. The shot startled the witness, who did not at first understand what had occurred.   She asked deceased: "What did you do that for?" and then realized that he had been shot and was dead.   She then fled from the house. followed by Willie Bibb, passed through the south door, around the east corner of the house, and over a path through the turnip patch to Hickerson's house.   It was then about dark.   Witness did not see anybody running from the house toward the slough, or in any other direction.   She did not see the defendant at any time on the fatal day.   Willie Bibb did not tell her afterwards that he saw defendant running from the house towards the slough, after he, Bibb, ran out of the house.   Willie did not tell the witness on that evening that he had seen defendant hiding behind a willow stump with his gun, and she did not threaten to whip Willie if he told it.   Willie Bibb did not tell her that he saw the defendant on Rickelman's farm on the preceding Sunday, and that defendant charged him to tell her to make him, defendant,

a cake, and that he would come for it the next rainy day, or night. The witness protested that she did not know who killed deceased, and declared that if she did know who the murderer was she would denounce him.

Cross examined, the witness said that for several years prior to her marriage to the deceased she lived with defendant as his wife. She married deceased in June, 1887, having left defendant about three weeks before that time. The defendant begged witness not to leave him and marry deceased, and became angry with deceased about witness. Deceased often quarreled with witness about defendant. It was the witness's shoe that Mr. Barlow took from the house and applied to the track near the stump. The witness had not been about that stump on that day, and could not explain how her track came to be there. Witness went to town after her arrest, in the custody of Burrell Young and Tom Sanders. She had no recollection of telling Sanders, on the way to town, that defendant killed deceased. She had no recollection of telling Sanders that Willie Bibb delivered to her a message from defendant to bake him a cake, and that he, defendant, would call for it on the first rainy day or night. Witness did not know who killed deceased, but, being asked: "Who do you believe killed Addison Washington?" she replied: "I think defendant killed him "

R. Ledbetter testified, for the defense, that, while confined in jail with deceased, some time prior to the latter's death, he heard the deceased say that somebody had threatened his life, and that he was afraid of being killed. At another time he heard Mr. Tom Battle tell deceased to be cautious or he would be killed.

E. Anderson and William Watson testified that they were acquainted with the defendant, and knew his reputation as a peaceable, law abiding citizen, and that it was good. The defense closed.

Tom Sanders testified, for the State, in rebuttal, that he knew the defendant, who was well known throughout the neighborhood by his nickname "Spider." Just before the arrest of Sarah Washington, the witness asked her who killed Addison Washington, and she replied that she did not know. She was afterwards arrested, and was taken to jail by witness and Mr. Young. On the way to town, she spoke of being a member of the church, and addressed witness as "Brother Sanders." Witness replied: "If you are a member of the

church you ought to tell the truth about this; and if you will tell the truth, Mr. Rice (the prosecuting attorney) will turn you loose, and not put you in jail." She then said that "Spider" killed the deceased. Witness asked her who? and she replied: "Louis Hawkins." In answer to another question by witness, she said that Willie Bibb told her on the previous Sunday that he saw defendant at Rickelman's farm, and that defendant charged him to tell her to bake him, defendant, a cake, and that he would come for it on the first ensuing rainy day or night. Witness then called Mr. Barlow, who was riding along some distance behind, and when he came up Sarah repeated to him what she had said to witness. Just as she was being placed in jail Sarah said that, contrary to witness's assurance, they were going to put her in jail, and that what she had said to witness on the road she would retract because it was a lie. She had just then passed through a large crowd of negroes.

Recalled; later in the trial, this witness stated that he did not use any violence or threats to extort the said statements from Sarah Washington.

John Barlow was then recalled by the State, and corroborated Sanders as to the declarations of Sarah Washington on the road to town.

Sarah Washington, recalled, by the defense, admitted that she made the statements imputed to her by Sanders and Barlow, on the way to jail, but declared that she made them because Sanders told her that Barlow was behind with a rope, and that a mob would be organized and hang her if she did not admit that defendant killed deceased. She thereupon made that and every other declaration Sanders and Barlow required of her, and would have made any other dictated by them, as she was afraid of mob violence. Those statements made by her while in arrest were false, and her present testimony true.

William Shelton testified that he examined the defendant's gun.as soon as it and the defendant were brought to jail on the morning after the killing, and before the load was drawn out. The inside of the barrel was rusty, and the witness, who had a great deal of experience with fire arms in the Confederate army, did not think that gun had been recently discharged.

J. R. McDonald and W. Shelton, for the appellant.

W. L. Davidson, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.  This appeal is from a death penalty inflicted upon a conviction for murder of the first degree.

Several questions are propounded by the bills of exceptions reserved for appellant during his trial.  1.  One of the main witnesses for the prosecution was a boy eleven years old, and he was examined at the instance of the defendant, with the purpose of testing his competency as to intelligence, and his understanding of the obligations of an oath.  It appears that after his examination by defendant's counsel, he was re-examined by the court, but the statement in the bill of exceptions gives us but a very meagre account of the extent of the examination.  He seems to have known but little, if anything, about the obligations of an oath, but he knew that it was wrong to tell a lie, and that it was right to tell the truth.  That portion of our statute relative to the matter denounces as incompetent to testify in criminal actions "Children or other persons who, after being examined by the court, appear not to possess sufficient intellect to relate transactions with respect to which they are interrogated, or who do not understand the obligation of an oath."  (Code Crim. Proc., art. 730, sub-div. 2.)

As stated in the bill of exceptions, the objection made to the witness was that he "was incompetent to testify *because of his youth and ignorance.*"  It is not objected that he did not "understand the obligation of an oath."  If that had been the objection it might, and perhaps could, have been obviated then and there by a further examination—and, if necessary, by instructions given the witness under direction of the court.  (Taylor v. The State, 22 Texas Ct. App., 529; Holst v. The State, 23 Texas Ct. App., 1; Comm. v. Lyons, 9 Crim. Law Mag., Mass., 68.)

The objections urged are solely as to his "*youth and ignorance.*"  "There is no precise age under which a child is deemed incompetent to testify, but when under fourteen years of age, competency is determinable by an examination, and the action of the court thereon will not be revised in the absence of a showing that its discretion was abused, and unless an abuse of discretion is apparent."  (Willson's Crim. Stats., sec. 2435.)

Objection, therefore, simply upon the ground of "youth" was no objection.  As to the objection under the ground of "ignorance," suffice it to say that this witness's testimony, as detailed in the statement of facts, is as clear, circumstantial, positive and intelligent as most witnesses of mature years and

good, ordinary education could give concerning the same facts and circumstances, and, more than that, his testimony throughout is corroborated by the physical facts discovered and detailed by other witnesses in the strongest possible manner. No error is perceived in the court's overruling the objections to his testimony upon the grounds of "youth and ignorance."

2. For the purpose of impeaching the testimony given by the wife of deceased at the trial the prosecution was allowed, over objection of defendant, to prove contradictory statements made by her to officers who had her under arrest as one of the parties implicated in the murder, whilst they were conveying her to jail the day after it occurred. The objections to the testimony urged by defendant were that she was under arrest or in duress at the time, and that her declarations were hearsay. Prior to the trial of this defendant she had herself been tried and acquitted. The objection that the witness was under arrest at the time she made the contradictory statements was not available by this defendant. It is the confession or admission of *a defendant who is on trial*, made when *he* is under arrest, which can not be used against him except under the circumstances and upon the conditions mentioned in the statute. (Code Crim. Proc., arts. 749, 750.) This statute does not apply nor extend to parties not defendants on trial. As to the declarations being hearsay, whilst that was true in so far as this defendant was concerned, they were nevertheless admissible to impeach the witness, and that was the sole purpose of their admission, as the jury were very properly and explicitly told by an instruction given them upon the subject by the learned trial judge. They were expressly limited and restricted in its consideration to the only purposes for which the evidence was admitted, and they could not have been misled as to the objects and purposes of its admission.

3. On defendant's motion for a new trial he assailed one of the jurors who tried the case for bias and prejudice against him as shown by statements of the juror made before he was placed upon the panel. This matter, in our opinion, is satisfactorily explained and settled against the objections urged to the juror, by the counter affidavit of the juror himself.

4. Some objections are raised to the charge of the court to the jury, but we have found it to be a clear, comprehensive and fair presentation of the law to the various phases of the case.

As to the evidence, though it is circumstantial, it is to our minds as cogent and convincing as such a case could well be. That the defendant is the guilty agent who assassinated the deceased in his own house whilst at his meals and unconscious of danger, and that he did so from revenge and jealousy, we have no doubt. After a fair and impartial trial he has had the extreme penalty of the law denounced against him, and because we have been unable to find in this record, which he has submitted to us on his appeal, any good or sufficient reason why his conviction should be set aside, the judgment is in all things affirmed.

*Affirmed.*